Good morning, Your Honor. I do represent Mr. Sanders. This case reminds me of a gentleman down in Effingham called Ed. Ed loves to fish for bass, as Ed loves to fish alone, and Ed had a couple of surprise snowstorms down in Effingham, and one happened to catch Ed's pregnant daughter, who happened to live next door at home, unable to get to the doctor at the time of delivery. The baby's born at home, and of course, everyone wants to know how much does his baby weigh? So, oh, we'll get Ed's fish scale. Well, the baby weighed 28 pounds. Everybody instantly knew there was something wrong with Ed's fish scale, and that's a problem with this case, that there's something very wrong with the ALJ scale, because if we look at the central component of his decision, it is at page 21, where he compares Mr. Sanders' status in 1994, and when he's seen Ms. Bierman in the six visits in 2008, over a span of six weeks, and again in 1999, I'm sorry, over six visits over a span of four weeks, that he's essentially the same, and that scale is completely broken. In 1994, and with Ms. Bierman, Mr. Sanders is working full-time, 50 to 60 hours a week, in some instances. He's a prison guard, he's a deputy sheriff. When he is under treatment, or during the period of time at issue in this case, he's not working. We also have a form completed by Dr. Montgomery indicating that for temporary disability purposes, there's not any duties that he's aware they could do for the township, and you have comparable statements by Mr. McDade. In 1994, and in 2008 and 2009, Mr. Sanders sought treatment. It was a rational, self-motivated decision. This treatment was when his doctors, I'm sorry, when his employer sent him to the hospital to be examined, and he remained under treatment ever after that, and never returned to work. The Is there any doctor who said that your client is unable to perform any work at all? Well, the court, and recently, you had the Hill v. Colvin case, I believe, where there was You were asked a question about this case, not about Hill v. Colvin. Right, and I believe my response would be in that regard, because in Hill v. Colvin, they noted that a 70% rating of disability by the VA equates to Social Security's determination. So that's, in this instance, we do have that determination, Your Honor. Other aspects that are We don't have any doctor offering an opinion in this case that your client is unable to perform any work. So you're relying solely on the VA benefits award? No, I think what you have in addition to that, you do have the statement by Dr. Montgomery where he completes the Temporary Disability Report form on January 29 of 2010, saying And he says, Dr. Montgomery said only that your client can't perform his work as a deputy sheriff or police officer. No, I beg to differ, Your Honor. He completed a form, and it's in the record twice, and it's split up because of the copying, I believe. It's not copied very well, but for the completion of the form, he certified that he was unable to do any duties for which the township might assign him, period. This is a municipality. It's a temporary disability all encompassing. He can't work for the municipality. That's not a categorical statement by the doctor that he can't perform any work anywhere. No, but in terms of the municipality, I think you're talking about certainly that anybody would think that they have unskilled work. You have janitors. That's unskilled work. I think it needs to be read in context. It means he can't perform his job as a deputy sheriff either out in the field or on desk duty or in some other less strenuous capacity. Not that he can't do anything whatsoever. That was the purpose of the form. It was temporary disability. It wasn't can he not do With respect to his then current employment? No, I strongly disagree. Immediate past employment? I strongly disagree, Your Honor. The very plain language in the form says, addresses his ability to do any work that the municipality might have and the municipality does have unskilled work. The import of the benefits claim is not particular to his ability to work for the municipality. His ability to do unskilled work, which municipality has. If that was the thrust of your claim, then you had to develop it a lot better than the record as it comes to us now. Well, I think my question is directly responsive to your question. The claim is developed in other directions, but you asked that particular question and I believe I addressed that. When we look at what this judge is trying to fit these facts into, we have a situation where, again, with Ms. Bierman, he's working with, in both prior circumstances, he's not on medication with Ms. Bierman. He's working, self-driven treatment. You have all of those type of things that are major factors distinguishing this, plus the fact that once these doctors begin treatment, you see, and you look at this case longitudinally, you have an individual who, okay, gee, we better get him away from being deputy sheriff. Can we put him in any other kind of position? You have a statement by Mr. McDade, and that's on page 297 of the record, that they also discussed various other techniques and made reference to what he might possibly do in the way of a job in the future. We have also the statement by Mr. McDade on March 5 of 2010, where their goal was to allow Mr. Sanders to prove to himself they can eventually go back to work in some position other than a deputy sheriff. Again, we're talking about people that they know he's not working. They're not saying, hey, in the meantime, it would be very helpful for you to go out and do some type of work. Instead, what you see with the VA is it would be helpful if you maybe went and lifted some weights and it worked out, which he did, and then the ALJ beat him over the head for that. And there's case law saying you don't do that. People try and follow prescribed treatment to get better. That's appropriate. If somebody enjoys an activity, you say, hey, do something enjoyable because that should help your mood. That's appropriate. So after we see the ALJ trying to fit this situation in a totally inappropriate bottle or box, then we have a situation where the ALJ then buttresses that by overstating things that he believes support his opinion, the principal one being that Mr. Sanders is noted to have embellished his symptoms when Mr. Montgomery saw him the very second occasion and never repeats it. And then we have in April, we have a comparable statement by Mr. McDade. But Mr. where the embellishment by the overstatement by the ALJ is that he leaves out the characterization of those. Dr. Montgomery says he's overstating them a bit. The a bit is dropped. Dr. Montgomery, I'm sorry, Dr. McDade, his reference to those statements is much softer too in terms of indicating that there are also times, so not every time, when he seems to exaggerate some of his PTS symptoms. Then you have to put this in the context of the longitudinal record. These statements occur four and a half months into treatment. The treatment record before this court is exactly two years, from November 19 of 09 to November 18 of 2011. There is not a single other statement by anyone else, including those two individuals, and what you see longitudinally is an ever increasing dosage of medications. You see an ever increasing assessment of the severity of his impairment. Those are the things that you see. So you take something that's less than 10 percent of, I'm sorry, less than 20 percent of the record, and you move away from that, and the rest of the record belies that type of conclusion. You also see then the gross overstatement or understatement of several things. Again, if we're looking at a scale, if you're looking at a scale, you have to use a correct scale, and you have to put the evidence that belongs on there. As the judge, he does not get to change the character of the evidence, and that's what he did. Mr. Sanders is an Iraq War veteran. All he asked for is, hey, put it on the table, fair and square. Don't use an askew scale, and don't misstate the evidence. Don't leave out the stuff that helps me. Look at it longitudinally. The judge did not do that. I'll save my remainder time for rebuttal. Thank you. Thank you. Mr. Sutterfield. Ms. Hahn. May it please the Court. Lou Hahn on behalf of the Commissioner of Social Security. Mr. Sanders has proved that he couldn't work as a deputy sheriff, but he hasn't proved that he is completely disabled under the Social Security Act. As Your Honor pointed out, in this record, as the LJ noted, there is no medical opinion that he's unable to do any job. In fact, we have his treating psychiatrist, Dr. Montgomery, in several instances in the record saying that while he can't work as a deputy sheriff, he could perhaps do other work. And in fact, at one point, Dr. Montgomery alluded to courthouse security as a possible line of work. His therapist, Mr. McDade, likewise never opined that throughout therapy he was unable to do any job. And notably, as Mr. Sanders' counsel also discussed, both of these treaters in two different instances in December of 2009 and April 2010 noted that Mr. Sanders seemed to be embellishing or exaggerating his symptoms. We do not have a case here where there's anything wrong with the ALJ's scale. The ALJ took the evidence as presented by Mr. Sanders, and it was always Mr. Sanders' burden to prove that he was disabled. And the ALJ did not ignore any of the evidence that was supportive of Mr. Sanders' claim for disability. Indeed, the ALJ discussed all of the relevant evidence, and perhaps not in the manner that Mr. Sanders would have liked, but if we accept Mr. Sanders' argument, then the ALJ was required to replicate the record exactly as it was stated, and that's not a standard that we hold ALJs to in these cases. The ALJ recognized all of the treatment that Mr. Sanders had gotten going as far back as 1994 when he was first diagnosed with PTSD. The ALJ then went through his treatment starting in December of 2009 with psychiatrist Dr. Montgomery, all the way through his therapy through the VA with Dr. Levine, and ultimately an examination with Dr. D'Souza. The ALJ recognized that he was a 70% disabled veteran, according to the VA, but the ALJ addressed that and reasonably determined that despite that, there were still jobs that Mr. Sanders could do according to the RFC, the Residual Functional Capacity that the ALJ in this case crafted, which was supported by substantial evidence. And then the ALJ determined that there were jobs that existed outside of law enforcement, which was one of the limitations that was included in the RFC to not deal with the effects of violence, that Mr. Sanders could nonetheless perform. And it is because of that that Mr. Sanders was not found to be disabled. And Mr. Sanders has not shown, based on this evidence and all of his characterizations of the evidence, that the ALJ committed any reversible error.  And the Commission rests on her brief, and we request that the Court affirm the District Court's decision for the Commission. Thank you, Counsel. Anything further, Mr. Sutterfield? You might have 30 seconds. I strongly disagree with the characterization of that the ALJ considered the evidence. No one is asking for him to go through and put it dot by dot by dot, that type of thing. But they are looking at the ALJ to engage in a longitudinal view of the evidence. And what you see, again, is an ever-increasing dosage of medications by Dr. Montgomery. You see the individual, Mr. Sanders, continuing to have agitation. And this is all in the context of the ALJ misstating the evidence. Thank you. Thank you very much. The case is taken under advisement.